UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLEOPATRA THOMPSON,

      Plaintiff,

v.                                                          Case No. 21-11054

NESTLE WATERS NORTH                      Sean F. Cox
AMERICA, INC.,                                    United States District Court Judge

      Defendant.
_____/

## OPINION & ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this civil action, Plaintiff asserts negligence and implied warranty claims against Defendant. Following the close of discovery, Defendant filed the instant motion for summary judgment. The parties have briefed the issues and the Court concludes that oral argument is not necessary. For the reasons set forth below, the Court DENIES the motion and Plaintiff's claims shall proceed to a jury trial.

## BACKGROUND

Plaintiff Cleopatra Thompson filed this action against Defendants Nestle Waters North America, Inc. and Sam's East, Inc. in state court and Defendants removed it to this Court based upon diversity jurisdiction.

The operative complaint is Plaintiff's First Amended Complaint. In it, Plaintiff alleges that on April 13, 2020, she purchased of a case of bottled Ice Mountain water at a store and that it was provided to the store by Defendant Nestle. (First Am. Compl. at ¶¶ 5-6). At the time of purchase, the entire case came with plastic wrap intact and covering the bottles of water. (*Id.* at

1

¶ 7).  Plaintiff alleges that on or about May 1, 2020, "by reason of partaking of said water [she] became sick, experiencing burning and soreness in her throat and mouth area."  (*Id.* at ¶ 8).  As a result of drinking that water, Plaintiff went to the Clio Urgent Care Clinic where she was diagnosed with "acute pharyngitis." (*Id.* at ¶ 9).  On May 4, 2020, Plaintiff spoke with representatives of Nestle and "informed them of the incident.  Plaintiff alleges that she had the water tested at a laboratory, which found the water was contaminated in a manner that is consistent with cleaning solution such as bleach.  (*Id.* at ¶¶ 11-12).

After Plaintiff's First Amended Complaint was filed, Defendants filed motions to dismiss.  In an Opinion and Order issued on November 3, 2021, this Court granted those motions in part and denied them in part.  The Court dismissed all claims against Defendant Sam's East, Inc., leaving Nestle as the sole remaining Defendant.  As to Defendant Nestle, the Court dismissed all counts against it with the exception of Counts I (negligence, manufacturing defect) and II (breach of implied warranty).  As to those two claims, this Court found that Plaintiff alleged sufficient factual allegations to state plausible claims against Nestle.

After the close of discovery, Defendant Nestle filed the instant summary judgment motion.  (ECF No. 30).

This Court's practice guidelines are included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement,

whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

Defendant complied with the Court's practice guidelines for summary judgment motions such that its motion includes a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.") and Plaintiff filed a "Counter-Statement of Disputed Facts" (Pl.'s Stmt.").

The relevant evidence submitted by the parties – *construed in the light most favorable to Plaintiff* – is as follows.

Plaintiff purchased two cases of water from a Sam's Club store on April 13, 2020.  (Pl.'s Dep. at 11-13; Pl.'s Ex. 1).  When Plaintiff picked up those cases of waters at the store, the cases were wrapped in plastic and everything looked fine.  (Pl.'s Dep. at 14-16).  Plaintiff did not observe any defects in the bottles of water or the caps on the bottles.  (*Id.*).

Plaintiff testified that she went right home after leaving the store and did not make any stops on the way home. Plaintiff testified that she lives alone and that no one besides her came into contact with the water between the time she purchased it and the time of the incident at issue.  (*Id*. at 17-18).  Plaintiff testified that on the date of the incident, she took a bottle of water out of her refrigerator, opened up the cap, and "took a big swallow of it because I was very thirsty.  And as soon as I picked it up and swallowed it, I immediately threw it right back up. And I jumped up out of the chair where I'm sitting, right next to the sink, and just started puking it out, and I was screaming."  (*Id*. at 20).  She testified this incident occurred on May 1, 2020,

3

around 6:00 p.m.  (*Id*. at 21).  Plaintiff testified that, to the best of her recollection, the cap was

sealed before she flipped it open.  (*Id*. at 24).  Plaintiff described the taste of the water as

follows:

> Q.    Picking up where we left off, can you please describe what the water
> tasted like after you took a drink of it on May 1, 2020.
> A.    I don't know.  It just – it tasted and smelled like a – I never tasted bleach,
> but I've used enough of it.  And it just – it was just awful.  It was just like
> poison, something poison was in the water.  It was not Ice Mountain
> spring water. It was poison water.  And I screamed out I been poisoned.  I
> started throwing it up in the sink, coughing.
> Q.    Can you describe or can you use some descriptive words to explain what it
> tasted like.
> A.    I've never tasted poison before.  All I can say from drinking that particular
> bottle of water, it tasted poisoned.  Like it was – like –
> Q.    What caused you to conclude that the water was poisoned?
> A.    Because it was not regular water.  It was – it burned.  It was burning my
> tongue. It was hard – I couldn't swallow it.  I swallowed it because I
> thought it was a regular bottle of water.  But it was just – it was like
> bleachy smelly.
>         It was just like someone just had – just – I don't know.  It was just
> – I don't know how to describe it. It was just poison tasting, just bleachy
> and chemicals, that's the word. There was chemicals in the water.  What
> type of chemicals, I don't know. All I tasted was chemicals and the smell
> was awful.

(Pl.'s Dep. at 28-29).

Plaintiff testified that, after she threw up the water, that smelled like bleach to her, she

called 9-1-1.  (*Id*. at 32).  An Officer Chase, from the police department for Genesee Township,

came to her house.  She testified:

> Q.    What – what did you report to Officer Chase when he arrived?
> A.    When he arrived, I told him what happened.  And he looked at the case, he
> said well, let's go through the case and see if anything looks – looks
> irregular.  So he kind of went – we kind of went through that case of
> water, because I only had the one case.

4

> Q.    Did you open the other bottles of water in that case?
> A.     No.  They all was clear.  They all looked fine.  So that's what – he – he
>        and I came to the conclusion that all the other bottles were fine.

(*Id*. at 34).  Plaintiff testified that she also called poison control after she drank the water.  (*Id*. at

40-41).

Plaintiff visited an urgent care clinic in Clio, Michigan on May 2, 2020, complaining of

irritation to the mouth and tongue and that her throat was burning.  (Pl.'s Dep. at 51-54).

Plaintiff was diagnosed with acute pharyngitis, unspecified.  (*Id*. at 54).  Plaintiff also followed

up with her own physicians, that she saw several times.

Plaintiff testified that she saved the bottle of water that she claims made her sick when

she drank it on May 1, 2020:

> Q.    Okay.  What – what did you do with the bottle of water that you drank on
>        May 1st?
> A.    The poisoned bottle of water, I put it to the side and I put it in some plastic
>        bags.  And I held onto it, I put it under my cabinet.
> Q.    Did you flip the cap back on?
> A.    Oh yeah.
> Q.    How long did you keep the water stored in – in your cabinet in the plastic
>        bag?
> A.    It's under there right now.  I still have partial bottled water. I have about
>        an ounce and a half or two ounces in the bottle still.
> Q.    Why did you – why did you keep an ounce or two ounces of the water?
> A.    For my own evidence, that's my bottle of water that I purchased and I
>        gave partially – part of it to my attorney when he asked for it and I gave –
>        I gave him a portion of it. And I kept a portion of it.  I wasn't going to get
>        rid of all of it because I need some evidence for my own records.

(*Id*. at 36).  Plaintiff testified that she poured some of the water from the bottle that made her sick

into an empty water bottle and gave it to her attorney, along with several full bottles from the

same case of water.  (*Id*. at 35-36).

Plaintiff contacted Nestle about the water on or about May 4, 2020, because she wanted to let them know that she had been poisoned.  (Pl.'s Dep. at 58-59).

Plaintiff filed this lawsuit on April 1, 2021.

During her deposition, Plaintiff testified that she has never worked for Nestle and that she has no knowledge or information about Nestle's bottling process.  (Pl.'s Dep. at 100).

In connection with this case, Plaintiff hired RTI Laboratories, Inc. ("RTI") to test the water that she claims was in the bottle that she drank on May 1, 2020.  (*See* Pl.'s Ex. 8).  RTI's report states that the sample is "consistent with a chlorinated bleach water contaminant."  (*Id*.; *see also* Kaufmen Dep. at 38-40).

Nestle also had the water provided by Plaintiff tested, and its expert found the water tested is not suitable for human consumption under the standards of the Safe Drinking Water Act.  (Ex. 10 to Pl.'s Br.; Simon Dep. Tr. at 8 & 13-15).

Nichole Latham ("Latham") is a Quality Manager for Nestle.  (Stmts. at ¶ 14).  During her deposition, Latham acknowledged that Nestle's own expert found bleach in the water sample that was tested.  (Latham Dep. at 11).  Latham testified that Nestle does not use bleach for any part of its manufacturing process.  (*Id.* at 23).  Latham acknowledged, however, that Nestle does have chlorine (with bleach in it) for disinfecting its domestic water and that it is kept two rooms away (about 75 steps) from the water goes out for sale to the public.  (*Id*. at 23-25).  Latham testified that it is access-restricted.  (*Id*. at 24).  She further testified:

> Q.   Okay.  And so approximately how many feet you said?
> A.   Seventy five would be my guess.
> Q.   So what employees are involved in dealing with the water that's chlorinated that has bleach in it?
> A.   It's our plant wells, they come on and off automatically.  Everything is automatic, nobody has to intervene.

> Q.      Who would monitor that to make sure it's happening the way it's supposed to be happening?
> A.      The quality tech, the quality tech will collect a sample from the sample port or from the hand sink.
> Q.      And who's that quality tech?
> A.      I don't know who it was that day.

(Latham Dep. at 25).

Latham testified that the type of water bottles at issue in this case are marked with specific codes that allow Nestle to determine the date on which the case of water bottles at issue left its facility – March 30, 2020. (*See* Def.'s Stmt. at ¶ 9-10). In support of its summary judgment motion, Defendant Nestle has submitted records of its testing procedures for that date. (*See* Def.'s Exhibits B through G). Nestle contends that its testing on March 30, 2020 did not detect any contaminants in the water. Latham testified that Nestle did not receive complaints from any other persons about the water that left its facility on March 30, 2020. (Latham Dep. at 41).

### STANDARD OF REVIEW

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This Court must view the evidence in the record, and reasonable inferences that can be drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When reviewing a summary judgment motion, this Court does not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### ANALYSIS

7

The only remaining claims against Nestle in this case are Count I (a negligence count that alleges a manufacturing defect) and Count II (breach of implied warranty claim). (Stmts.' at ¶ 7). The parties agree that Michigan law applies in this diversity case.

Defendant's motion asserts that it is entitled to summary judgment in its favor as to both counts. Defendant asserts that it "undertakes great efforts to continuously monitor and verify the quality of the water" that is processed through its facility in order "to prevent an incident such as the one alleged in this case from ever happening." (Def.'s Br. at 9). In support of its motion, Defendant submitted evidence of its testing. Defendant contends that its evidence forecloses "any possibility that the subject water bottle was unsafe to drink upon shipment from Nestle's facility on March 30, 2020," based on its testing procedures. (*Id*. at 11). It contends that, combined with the "lack of any similar consumer complaints related to water bottled at or near that time (or otherwise) all but renders it impossible that this single bottle was somehow negligently manufactured, or defective, when it left Nestle on March 30, 2020." (*Id*. at 11; *see also* Def.'s Br. at 16, arguing that Defendant's evidence regarding its testing procedures "completely forecloses any chance that the bottle was defectively manufactured."). Defendant contends that Plaintiff must show more than mere conjecture at this stage and relies on *Marderosian v. Stroh Brewery Co.*, 123 Mich.App. 719, 333 N.W.2d 341 (1983).

In response, Plaintiff notes that at the motion-to-dismiss phase, this Court found that Plaintiff's complaint included sufficient facts to state plausible claims against Defendant and asserts that Plaintiff has now produced *evidence* to support those allegations. Plaintiff contends that Defendant is essentially asking the Court to improperly make a credibility call (asking the Court "to believe Nestle's version and not Thompson's") and to not allow Plaintiff to use

8

circumstantial evidence to establish her claims.  Plaintiff argues:

> Nestle tries to convince this court to disregard Thompson's testimony, disregard the testimony of expert Kaufman, disregard the admissions by Quality Manager Latham, disregard their own expert's findings and instead determine credibility and weigh evidence to find that Nestle's production/bottling process is so airtight that it was impossible for the bleach to have made its way into the bottle of water plaintiff drank from when it left Nestle.  However, the weight and credibility of such testimony is to be determined by a finder of fact.

(Pl.'s Br. at 8).  Plaintiff further asserts that Defendant's motion "is at war with circumstantial evidence.  Throughout their brief, Nestle suggests that for Plaintiff to have a legal claim she must have something akin to an eyewitness who directly saw how the bleach was put in the bottle of water during Nestle's manufacturing and bottling process" although Michigan law allows claims to be established through circumstantial evidence.  (*Id.* at 12).

The Court agrees with Plaintiff that Defendant is essentially asking the Court to make credibility[1] determinations and require Plaintiff to produce direct evidence to support her claims.  And although Plaintiff did not address the case relied on by Defendant, *Marderosian*, the Court concludes it does not aid Defendant.

In *Marderosian*, the plaintiff was a busboy who suffered near total loss of vision in one of his eyes when a capped beer bottle exploded close to his face.  *Id*. at 723.  The bottle was never produced and the "Plaintiff's proofs concerning the condition of the bottle when it arrived at the restaurant were vague."  *Id.*  There was a bench trial and the "trial judge granted the defendant's motion for involuntary dismissal under GCR 1963, 504.2."  *Id.*  Such a motion "calls upon the trial judge to exercise his function as trier of fact, weight the evidence, pass upon the

---

[1]Defendant's Reply Brief provides its assessment of what actually happened here – that "the water was doctored while in Plaintiff's possession."  (Reply Br. at 4).  And it may have evidence to support that theory.  (*See* Expert Report attached as Exhibit A to Reply Brief).

9

credibility of witnesses and select between conflicting inferences." *Id.* The trial judge in *Marderosian* ultimately ruled in favor of the defendant, concluding that while the plaintiff "produced some evidence of a defect in the bottle leading to the explosion" there "was inadequate proof to connect the defect with the defendant. *Id.*

Significantly, the ruling in *Marderosian* was not a summary judgment ruling; it was a ruling on a motion that required the trial judge to weigh the evidence, assess credibility, and select between competing inferences. Moreover, the facts of this case are inapposite to those of *Marderosian*, as was the situation in *Coleman v. Maxwell Shoe Company, Inc*., 2007 WL 551607 (E.D. Mich. 2007) a case wherein Judge Zatkoff found the defendant's reliance on it misplaced and denied summary judgment. Here, the allegedly defective product is not unavailable. To the contrary, it was produced by Plaintiff and tested by her expert and Defendant's expert. Plaintiff has identified a specific defect in the water – that it contains chemicals and is not suitable for human consumption – and both experts found the same as to the sample provided by Plaintiff. Plaintiff has also produced evidence to show that Defendant does have chlorine (with bleach in it) for disinfecting its domestic water and that it is kept two rooms away (about 75 steps) from the water goes out for sale to the public. (Latham Dep. at 23-25). The "existence of a defective condition may be inferred from circumstantial evidence alone." *Holloway v. General Motors Corp*., 399 Mich. 617, 636 (1978) *Id.*; *see also Perkins v. Ralson Foods*, 2012 WL 13028278 (W.D. Mich. 2012) (denying summary judgment where the plaintiff produced circumstantial evidence of defect in product (presence of foreign objects in oatmeal)). Plaintiff has also offered circumstantial evidence tracing the alleged defect into the hands of Defendant: 1) the water and bottling process was under the exclusive control of Defendant; 2) Defendant had chlorine (with

bleach in it) on the premises just 75 feet from the bottling process; 3) the case of water Plaintiff purchased was entirely enveloped in plastic wrap and the bottle was sealed; and 4) Plaintiff came right home after purchasing the case of water and no one had access to it while it was in her house before she drank it.

## CONCLUSION & ORDER

Accordingly, the Court ORDERS that Defendant's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  January 12, 2023

11